UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARK RIORDAN and KATHLEEN BRUZY, : : : | |
| Plaintiffs, : : | No. 3:02CV1132(DJS) |
| v. : : | |
| TROOPER ANDRE JOYNER, SERGEANT F.J. WHELAN, OFFICER RICHARD T. HANNON, and JOHN DOES 1-4, : : : : | |
| Defendants. : | |

**MEMORANDUM OF DECISION AND ORDER**

On June 28, 2002, plaintiffs Mark Riordan and Kathleen Bruzy brought this action for damages against defendants Trooper Andre Joyner and Sergeant Francis Whelan of the Connecticut State Police, and Officer Richard Hannon of the North Haven Police Department pursuant to 42 U.S.C. § 1983, claiming violations of their rights under the Fourth Amendment of the United States Constitution, assault and battery, and intentional infliction of emotional distress. Now pending are defendants' Joyner and Whelan's motion for summary judgment (dkt. # 33) and defendant Hannon's motion for summary judgment (dkt. # 41) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, these motions are **GRANTED**.

### I. FACTS

The factual basis for this lawsuit is a traffic stop resulting from a report that gunshots had been fired from Bruzy's

vehicle. The following are undisputed material facts.[1]

On December 19, 2001, Bruzy left her place of part-time employment at approximately 9:00 p.m. with her fiancé, Riordan. Bruzy and Riordan each had their own vehicles and proceeded to drive home in their separate cars. On this evening, they traveled northbound on Interstate 95 and merged northbound onto Interstate 91 in the New Haven area.

On said date, an individual named Henry Angelico, by way of his mobile telephone, contacted the Connecticut State Police and reported that he had heard a loud noise come from a vehicle near him on I-91 and that he saw smoke coming from the driver's side window of this vehicle. Angelico described the make of the vehicle as a sport-utility vehicle and also provided its license plate number. The vehicle in question was owned and operated by Kathleen Bruzy.

While on patrol, Joyner received a dispatch at 2306 hours. The dispatcher sent Joyner to I-91 northbound by exit number eight to investigate Angelico's report. The dispatcher informed Joyner that Angelico could still see the vehicle from which he

---

[1] Although plaintiffs have denied certain statements set forth in defendants' Local Rule 9(c)(1) Statements, plaintiffs have not cited to any evidence in support of their denials, which is a basis to deem the statements in question admitted. The court however, has relied upon the evidence submitted in support of defendants' statements and the record as a whole in determining which facts about which there is no reasonable dispute.

believed the shot had been fired, and that she had asked Angelico to engage his vehicle's flashing lights so that Joyner could identify his vehicle. Whelan, who was the shift supervisor, monitored this dispatch.

Shortly after Joyner located Angelico, Bruzy's vehicle exited I-91 and entered the Route 40 connector. Joyner decided to stop Bruzy's vehicle on the Route 40 connector. At this point, Joyner engaged his flashing lights, and Bruzy switched lanes to allow Joyner to pass her. Joyner then positioned his vehicle behind Bruzy again, and she then moved into the breakdown lane where Joyner shone a spotlight on her car. At that time, Riordan also drove his vehicle into the breakdown lane in front of Bruzy's vehicle. Riordan did not exit his car. Bruzy waited in her vehicle for the trooper to come to her vehicle.

Joyner then shouted from his vehicle for Bruzy to place her hands outside her vehicle. When Bruzy looked toward Joyner, she noticed that he had come up to the rear of her vehicle and was pointing a shotgun in her direction. Joyner asked Bruzy to get out of the vehicle, and she did so by opening the door from the outside of her car. Joyner instructed Bruzy to face forward, place her hands in the air over her head and walk backwards towards his commands.

When Bruzy was in front of Joyner, he asked her if she had a gun in her vehicle. Bruzy answered that she did not, and Joyner

then proceeded to pat her down. After he patted her down and did not find any weapons, Joyner handcuffed Bruzy. Joyner indicated to Bruzy that the handcuffs were being placed on her for her safety and his. Joyner also told Bruzy that there was a report that a shot had been reported from her vehicle. At that point other law enforcement officers began to arrive. Joyner then assisted Bruzy to the front of her vehicle and positioned her so that she was facing toward the windshield of her car. Joyner then asked if Bruzy knew who was parked in front of her car, and she responded that it was her fiancé. Joyner asked another officer to check Bruzy's fiancé out.

Once Joyner placed Bruzy in handcuffs, he went to speak to Angelico. Angelico described what he believed had taken place on I-91 and confirmed that Bruzy's vehicle was the vehicle he had called the police about. Joyner inspected Angelico's vehicle for any damage that could be caused by gunfire, and he did not find any gunfire damage.

Joyner and several other officers then searched Bruzy's vehicle as she looked on. Joyner and the other officers did not ask Bruzy for permission to search her vehicle. Joyner asked Bruzy if he was going to find anything while he and the other officers were searching her vehicle. Bruzy responded that they would not. The officers who searched Bruzy's vehicle did not find a weapon or any evidence that a firearm had been discharged.

After Joyner had placed Bruzy in handcuffs, two North Haven officers approached Riordan's vehicle and asked who he was. Riordan responded that he was Bruzy's fiancé. The officers then asked Riordan to step out of the vehicle. Riordan complied with their request, and the officers led Riordan to the back of his vehicle and handcuffed him. After the officers placed Riordan in handcuffs, a third officer came over to Riordan's vehicle and proceeded to search it. The officers did not ask Riordan for permission to search his vehicle.

While the officers searched his vehicle, Riordan's handcuffs started to feel tighter. Riordan told the officers that the handcuffs were getting tight, but the officers did not loosen the handcuffs and stated, "Let them." A few minutes later, Riordan again stated that the handcuffs were too tight and an officer came over and loosened the handcuffs. After a period of approximately five minutes, an officer came over to Riordan, uncuffed him, and told him he could go over to Bruzy.

At 2330, Whelan arrived on the scene and, after speaking to Joyner, directed Joyner to release Riordan and Bruzy. Joyner went over to Riordan and Bruzy and explained that they were free to go and that the man who had reported the incident was sorry. This was the first time that Riordan and Bruzy became aware of Angelico's presence. Between fifteen and twenty minutes had elapsed from the time Joyner stopped Bruzy's vehicle until Joyner

told her she was free to leave.

## II. DISCUSSION

Riordan and Bruzy allege that Joyner, Whelan, and Hannon violated her Fourth and Fourteenth Amendment rights. Specifically, Riordan and Bruzy claim that defendants subjected them to false arrest and unreasonable force.[2]  Riordan and Bruzy also assert the state law torts of assault and battery and intentional infliction of emotional distress.  Defendants have moved for summary judgment with respect to all counts of the complaint.  Defendants deny liability on all counts and raise the affirmative defense of qualified immunity for the federal claims.

### A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317,

---

[2] Plaintiffs have abandoned their malicious prosecution claims.  As such, the court will enter judgment for all defendants on this claim.

323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

### B. FOURTH AMENDMENT

Both Riordan and Bruzy assert that they were arrested without probable cause and subjected to unreasonable force in violation of the Fourth Amendment to the U.S. Constitution.  The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  The Supreme Court has held that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited

purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment's] provision." Whren v. United States, 517 U.S. 806, 809-10 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren, 517 U.S. at 810; see Terry v. Ohio, 392 U.S. 1, 19 (1968) (holding that the court must determine "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."). Attendant to the stop, the officer is permitted to conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27.

Plaintiffs claim that defendants' actions exceeded the scope of an investigatory traffic stop and amount to a de facto arrest. "The warrantless intrusion on an individual's liberty and possessory interests that was sanctioned in Terry and [United States v. Place, 462 U.S. 696, 703 (1983)] must be 'reasonably related in scope to the circumstances which justified it initially.'" U.S. v. Hooper, 935 F.2d 484, 494 (2d Cir. 1991) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 542 (1985)). "Such a seizure must be 'minimally intrusive of [an individual's] Fourth Amendment interests' to be justifiable based

on reasonable suspicion. . . .  If the intrusion becomes excessive, it ceases to be a Terry type detention that can be justified based on reasonable suspicion and instead becomes a seizure that requires a showing of probable cause." Id. (citing United States v. Place, 462 U.S. 696, 703 (1983)) (alteration in original).

In determining whether a seizure is an investigatory stop or a de facto arrest,

> the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used."

U.S. v. Vargas, 369 F.3d 98, 101 (2d Cir. 2004) (quoting United States v. Parea, 986 F.2d 633, 645 (2d Cir. 1993)).  The presence of one of these factors standing alone, though, does not necessarily convert a Terry stop into a de facto arrest; "although '[u]nder ordinary circumstances, . . . using handcuffs [is] not part of a Terry stop[,] intrusive and aggressive police conduct' is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.'" Vargas, 369 F.3d at 102 (quoting United States v. Miles, 247 F.3d 1009, 1012 (9th Cir. 2001)).  Further, "the fact that the officers approached a stopped car with guns drawn in order to protect themselves and bystanders on the street [does

not] necessarily transmute a Terry stop into an arrest." Parea, 986 F.2d at 644. As the Supreme Court has stated, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." Terry, 392 U.S. at 23.

Joyner's decision to stop Bruzy's vehicle and place Bruzy in handcuffs was a permissible Terry stop. In order to demonstrate reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. These facts must be "judged against an objective standard: would the facts available to the officer at the moment of seizure . . . 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" Id. at 21-22. In order to decide if a seizure is reasonable, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

Here, Joyner had sufficient information to form a reasonable suspicion that Bruzy was armed and that she had discharged a firearm while driving on I-91. Joyner acted upon information provided by a disinterested citizen, Angelico, who both identified himself and stayed on the scene. Although Angelico

was himself not positive of what had transpired, he did feel compelled to call 911 to report the occurrence.  Joyner had no reason to believe that Angelico's account was unreliable, and, therefore, justifiably took extreme precaution in securing Bruzy for questioning.  Given the gravity of the possibility of an armed driver shooting at cars on a highway, Joyner's response, including the search of her vehicle, was reasonable as a matter of law.  See Oliveira v. Mayer, 23 F.3d 642, 646 (2d Cir. 1994) ("[W]henever this Court and other circuits have found an intrusive detention to be only a Terry stop, the police have always had a reasonable basis to believe the suspect was armed or otherwise dangerous. . . .").

Likewise, Riordan's detention in handcuffs, executed by unnamed North Haven police officers, was a permissible Terry stop.  Riordan was on the scene of a police investigation of his fiance's discharge of a firearm on a highway.  Riordan was also traveling with Bruzy on I-91.  He stated that he was the fiancé of the target of the police investigation.  Although Riordan had not been disruptive to the investigation, there was the potential that he could do so.  Objectively speaking, the justification for placing Riordan in handcuffs was twofold: (1) to prevent him from disrupting the investigation of Bruzy; and (2) to determine if Riordan had any role in the suspected criminal activity.  As such, the officers acted reasonably in securing Riordan with

-11-

handcuffs and searching his vehicle for weapons prior to concluding that Riordan was not a threat and that no illegal activity had taken place.

Defendants' use of force while executing the Terry stops of Bruzy and Riordan was reasonable. "A free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard. . . ." Graham v. Connor, 490 U.S. 386, 387 (1989).  Under Graham, "[t]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.  Courts conducting this reasonableness inquiry must evaluate the specific facts of the case, "[i]ncluding the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

Here, the severity of the crime at issue justified removing Bruzy from her vehicle at gunpoint and placing Bruzy and Riordan in handcuffs.  Defendants reasonably suspected Bruzy of possessing and discharging a firearm; ordering Bruzy to exit her

vehicle at gunpoint was therefore a reasonable protective measure until Joyner could ascertain whether Bruzy had a weapon on her person.  Handcuffing Bruzy and Riordan was also a reasonable protective measure until defendants could rule out the possibility that Bruzy or Riordan could access a weapon. Defendants used reasonable force to protect themselves under the circumstances.

In sum, the court finds that no defendant violated the Fourth Amendment as alleged in the complaint as a matter of law. Therefore, judgment as a matter of law shall enter with respect to each plaintiff's federal claims.

### C. STATE LAW CLAIMS

Plaintiffs' state law claims shall be dismissed without prejudice because the court has disposed of their federal claims prior to trial.  "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  Castellano v. Board of Trustees of the Police Officers' Variable Supplements Fund, 937 F.2d 752, 758 (2d Cir. 1991) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).  "If it appears that the federal claims . . . could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional

circumstances."  Kavit v. A.L. Stamm & Co., 491 F.2d 1176, 1180 (2d Cir. 1974).

### III. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment (dkt. #s 33 & 41) are **GRANTED** with respect to plaintiff's federal claims.  Judgment in favor of the defendants shall enter all counts or claims brought pursuant to 42 U.S.C. § 1983 set forth in the amended complaint.  All counts of the amended complaint alleging causes of action under state law are **DISMISSED without prejudice**.  The Clerk of the Court shall close this file.

So ordered this 31st day of March, 2005.

**/s/DJS**
_____
**DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE**